IN THE MATTER OF THE JUDICIAL SETTLEMENT OF THE FIRST ACCOUNT, AND FIRST SUPPLEMENTAL ACCOUNT, OF WILLIAM MITCHELL, AS SOLE ACTING EXECUTOR OF THE LAST WILL AND TESTAMENT OF CLARISSA E. CURTIS, DECEASED.

*Tenancy by the curtesy — marriage and birth of issue before the married women's acts — right of the husband to the wife's real property subsequently acquired — to the wife's personal property — equitable conversion — contribution — "proceeds of a sale" means the net proceeds — taxes — a controversy under Code of Civil Procedure, section 2812.*

A husband and wife were married and had issue prior to the passage of the married women's acts (chap. 200, Laws of 1848, as amended by chapter 375, Laws of 1849), and in 1856, through a third person, the husband conveyed certain real estate to his wife.

*Held*, that the husband did not, by reason of the marriage and the birth of issue prior to 1848, acquire a vested right to a tenancy by the curtesy in such lands, which the wife could not defeat by a subsequent testamentary disposition thereof

That property acquired by the wife subsequent to the marriage was subject to any change, as to its disposition on her death, which the legislature might direct.

That the husband was entitled to the personal property of the wife acquired before the passage of the married women's acts.

The will of the wife, which related to both real and personal estate, described a piece of real estate, and stated that in the event of its sale during her lifetime, or of a sale after her death, " then after such sale and from the proceeds thereof " she gave an annuity to her husband. Bequests to other persons were also made " from the proceeds of the sale," and a power of sale was given to her executors.

*Held*, that there was an equitable conversion of the real estate into personalty.

The daughters were the principal beneficiaries under the will, which contained general and specific gifts, one of the latter being of the real estate upon the proceeds of which was charged the annuity to the husband.

*Held*, that the taxes upon this real estate, whether accruing before or after the death of the testatrix, should be paid from the proceeds of its sale, and that the legacy to the daughters was not obliged to contribute to the payment thereof.

The "proceeds" of a sale are ordinarily the amount thereof after deducting the expenses, including taxes.

In determining whether a bequest is general or specific the intention of the testator, as deduced from the whole will, must govern.

A few weeks after leasing a house for a year the testatrix died, and her daughters continued to occupy it until the end of the term. The landlord assigned his claim for rent to one of the daughters, who presented it to the executor for payment. The executor disputed it.

*Held*, that the daughter was entitled to payment, and that the executor had no right, under section 2812 of the Code of Civil Procedure, to retain a sum to meet it, as being " a controversy which arises respecting the right of a party to share in the money or other personal property to be paid, distributed or delivered over."

APPEAL by Clara Isabelle Curtis, as the assignee of the claim of Merritt Merwin against the estate of Clarissa E. Curtis, deceased, for rent of a house at Bridgeport, occupied by the decedent in her lifetime, from the following portions of the decree of distribution, entered in the above-entitled proceeding in the Surrogate's Court of the county of New York on the 2d day of March, 1891, after a reference had been made to William P. S. Melvin, in whose report* the facts fully appear:

*First.* From the following portion of said decree : "And it appearing that Clara Isabelle Curtis, as assignee of Merritt Merwin, claims

---

* WILLIAM P S. MELVIN, *Referee*.— The facts in this case are simple, and, in the main, undisputed, but the objections that are urged by the husband of the testatrix and her children are of the utmost importance. It appears that the testatrix, Clarissa E. Curtis, and James L. Curtis intermarried in the city of New York on June 18, 1832. There were four children by the marriage, of whom two survive, namely, Clara Isabelle Curtis, born April 1, 1833, and Julia Frances Munson, born September 19, 1838. Both these daughters unitedly file objections to the account of the executor, and their father, separately, and in his own behalf, files objections. The latter claims a right in the real estate left by his wife as tenant by the curtesy; and, further, that the entire personal estate left by his wife belongs to him after payment of her debts and funeral expenses; and, finally, that no distribution of the proceeds of the real or personal estate should be ordered on this accounting, and that no distribution of the proceeds of the real estate can be directed until after his death. His daughters, on the other hand, accepting the will of their mother, substantially limit their contention to this, briefly stated: That a certain bequest in their favor should not be defeated by devoting the property covered by the terms of the bequest to the payment of taxes, assessments and other charges upon the real estate at the time of the death of their mother.

The material portions of the will of Mrs. Curtis, so far as this proceeding is concerned, are as follows:

"*First* I give and bequeath all my jewelry, laces and other wearing apparel, and all my silver and plated ware, all my paintings, pictures, books, bookcases, and all my household goods, stores and furniture to my daughters, Clara Isabelle Curtis and Julia Frances Munson, share and share alike, absolutely. In case either should die before me, her share to go to the survivor."

"*Secondly.* I direct my executor to pay all my debts and funeral expenses."

"*Thirdly* In the event of a sale in my lifetime of my real estate situated between 107th street and 108th street and the Boulevard and Riverside Park, in the city of New York, or in the event of a sale after my death, then, after such sale, and from the proceeds thereof, I give an annuity of twelve hundred dollars to my husband, James L. Curtis."

"*Fourthly.* All the rest of my personal property owned by me absolutely, amounting now to about twenty-six thousand dollars, except the proceeds of said

that the sum of four hundred and twenty dollars, with interest from the 9th day of August, 1887, is due to her from the estate of the testatrix for the rent of the house No. 86 South avenue, Bridgeport, Connecticut, and that the executor claims that there should be deducted from said sum of four hundred and twenty dollars and interest the amount of the rent of said premises which accrued between the 3d day of November, 1886, and the 16th day of October, 1887.

" And it further appearing that said deductions will amount, with

---

plot of real estate, I give and bequeath to my executors, hereinafter named, in trust to receive and collect the income, interest, dividends and profits thereof, and to apply the same to the use of my daughters, Clara Isabelle Curtis and Julia Frances Munson, during their lives, share and share alike, and to the survivor for life."

"*Fifthly*. I give, devise and bequeath my plot of real estate, or the proceeds thereof, if sold before my death, to my said executors in trust to divide the same into eight equal portions, and to receive and apply the rents, interest, income, dividends and profits of (3) three of such portions to the use of my daughter Clara Isabelle Curtis during her life; and of (3) three other of said portions to the use of my daughter Julia Frances Munson during her life; and of one of said portions to the use of my granddaughter, Edith Hastings, during her life, and of the remaining portion to the use of my grandson, Ernest Hastings, during his life."

"*Sixthly*. I give and bequeath from the proceeds of the sale of my above-specified plot of ground ($500) five hundred dollars to Eliza Fitzpatrick, and ($500) five hundred dollars to Elizabeth S. Higgins, who have been my dressmakers for many years."

Then follows a bequest of " all the respective remainders upon the respective life estates in the real and personal property hereinbefore created " to certain residuary legatees, coupled with a power of sale to her executors, or the one who should qualify, at such time as they may deem fit.

This will was made or dated March 30, 1882.

At the time of the death of Mrs. Curtis she owned considerable personal property. All of it was included under the terms of the first of the foregoing bequests, except a block of railroad stocks, inventoried by the executor as 250 shares of the capital stock of the New York Central and Hudson River Railroad Company at a value of $26,250, besides a sum in cash, namely, $2,420.43.

1. Now, as to the real estate left by the testatrix. It appears that on the 29th day of December, 1856, Mr. Curtis executed, under seal, a deed of bargain and sale to Eastburn Hastings. in consideration of the sum of twenty-five thousand eight hundred and thirty-four dollars and thirty-three cents, of eight lots on One Hundred and Eighth street in the city of New York, and also of thirty-one other lots in the same vicinity. The conveyance was made subject to a number of mortgages, the amount of which formed part of the consideration and the receipt of which consideration was in ordinary terms " hereby acknowledged." Afterwards, on

costs, to more than said· sum of four hundred and twenty dollars and interest;

"It is further ordered, adjudged and decreed that said executor shall not pay said sum of four hundred and twenty dollars and interest to said Clara Isabelle Curtis, but that he reserve from the personal property bequeathed by the fourth clause of said will the sum of five hundred dollars to protect the estate in the event that it should be determined in an appropriate tribunal that they, said Clara Isabelle Curtis and Julia Frances Munson, are liable for

the 30th day of December, 1856, Eastburn Hastings made a like deed, under seal, to Clarissa Emma Curtis, the wife of James L. Curtis, for the very same consideration named in the deed to Mr. Hasting, conveying the same property subject to the same mortgages, which likewise formed part of the consideration, the receipt of which was also in terms acknowledged. These deeds were properly delivered and Mr. Curtis procured the same to be duly recorded. He testified, moreover, that the object in making the transfers was to secure his wife and his children against the contingency of his sudden death or future possible business embarrassments. He admitted that the title was not in him and that Mrs. Curtis continued in the undisturbed possession of the property, as " all was very comfortable with ourselves."

Some testimony was presented in this proceeding, on the part of Mr. Curtis, which showed that the consideration named in the deeds was not paid by either Mr. Hastings or Mrs. Curtis, but if this testimony was offered for the purpose of annulling the deeds it cannot avail. "A man is estopped by his deed to deny that he granted or that he had a good title to the estate conveyed, but he is not bound by the consideration expressed; because that is known to be arbitrary and is frequently different from the real consideration of the bargain." (*Wilkinson* v. *Scott*, 17 Mass., 249.) He is estopped from alleging that the deed was executed without consideration, though he may explain or vary it by parol proof. (*McRea* v. *Purmort*, 16 Wend., 460.) " In a conveyance by bargain and sale there must be some good consideration given or at least said to be given for the land, and if the deed makes mention of money paid, as in consideration of £100, or the like, and in truth no money is paid, yet the bargain and sale is good." (Shep. Touchst., 222; *Fisher* v. *Smith*, Moore's R., 569; *Chiles* v. *Coleman*, 2 A. K. Marsh, 228; *Bank of U. S.* v. *Housman*, 6 Paige, 526.)

But it is likely, however, that the testimony relative to the non-payment of the price mentioned was introduced not for the purpose of annulling the deeds, but rather to present in a strong light the idea of the contestant that these deeds operated in effect as a conveyance from husband to wife, and hence were not entitled to the favor of the law. It is proper, then, to consider the force of the objection of Mr. Curtis that his wife could not by her last will and testament defeat his alleged life estate in this realty as tenant by the curtesy, and this involves an examination of the terms of the statute which enabled women to hold property free from the control of their husbands, and conferred upon them

a proportionate part of the rent of said house, No. 86 South avenue, Bridgeport, Connecticut, as aforesaid," said appellant claiming that said decree should have ordered, adjudged and decreed that said claim of Merritt Merwin should be paid to her as his assignee by the executor out of the personal estate of said testatrix, and not retained by him as therein ordered.

*Second.* " From all other portions, parts and provisions of said decree which are inconsistent with the payment of the claim of this appellant as assignee of said Merwin to her by said executor."

---

power to devise the same as if they were unmarried. Its language is (Laws 1848, chap. 200, as amended by Laws 1849, chap. 375):

"Any married female may take by inheritance or by gift, grant, devise or bequest from any person other than her husband, and hold to her sole and separate use, and convey and devise real and personal property and any interest or estate therein, and the rents, issues and profits thereof in the same manner and with like effect as if she were unmarried."

In the first place, then, are these two deeds in effect a conveyance from Mr. Curtis to Mrs. Curtis ? That may have been the *effect*, but with the language of the statute before us, and, technically, we must say that it was not a conveyance such as the law excepted from its beneficent provisions. At the time these deeds were made it was the careful endeavor of the parties that they should not conflict with this statute. It was a question, Mr. Curtis testified, whether he had the right to convey property *directly* to his wife, and hence it was to obviate this objection that Mr. Hastings was selected as the intermediary. Direct conveyances between married parties were never encouraged, and though sometimes sustained in equity, in law they were always refused recognition because of the unity of husband and wife. To avoid this objection, consequently, it was the almost invariable rule to have such deeds made through the intervention of a trustee, and the statute was drawn not to prevent or discourage what had been allowed time out of mind (*Hunt* v. *Johnson*, 44 N. Y., 27), but to prevent a construction which would sanction such *direct* conveyances. Its very exception, as it were, explicitly declares that only conveyances *direct* from the husband to the wife shall not receive the benefit of its favor. The primary purpose of these acts was to enable every *feme covert* to hold property in her own right without the intervention of trusts or marriage settlements. (*Owen* v. *Cawley*, 36 N. Y., 603; *Wilbur* v. *Fradenburg*, 52 Barb., 478.) The object of the statute was remedial, as expressed in the very title of the act — to remove the disability which attaches to coverture, and should have a liberal construction. (*Darby* v. *Callaghan*, 16 N. Y., 79.) But this should be a construction liberal for the one sought to be benefited, not for him who seeks to turn the phraseology of the law by a liberal construction to his own favor to defeat conveyances to wives, and so far as such a one is concerned so far as the construction to be placed on the exception, the words, " from any person other than her husband," the law should be construed *strictissime*. It is the duty of the

*Cortlandt Irving,* for the executor, William Mitchell.

*E. A. S. Man,* for Clara Isabelle Curtis and Julia Frances Munson ; also for Clara Isabelle Curtis, assignee.

*William Fullerton,* for James L. Curtis.

BARRETT, J. :

We agree with the learned referee in the conclusion arrived at as to the main question presented in this matter, namely, that of

courts, when the intention of the legislature is apparent, to see that the design and object of the statute is not evaded by construction, but, on the contrary, is permitted to have full effect and operation. (*Hurd* v. *Cass,* 9 Barb., 366.)

If, then, the will of the testatrix as to this real estate was made under sanction of the law, had the husband any right to an estate as tenant by the curtesy of which she could deprive him by the execution of the will ? There is no question but what in the absence of a testamentary disposition by her of this property, the right of tenancy by the curtesy survives in this State, notwithstanding the enabling acts relative to married women. (*Hatfield* v. *Sneden,* 54 N. Y., 280.) But the contestant maintains that he had a *vested* right in this property on the birth of issue which could not be disturbed by statute; that the married women's acts can have no application to those who contracted the relation of marriage and had issue born to them before those acts, and he declares that an examination of all the cases reported in this State will fail to show in a single case that issue was born *prior* to the passage of the act. It is true that the reports fail in this particular, but counsel for the executor has called my attention to the very important case of *Thurber* v. *Townsend,* and the fact that the *papers on file in that case as well as the defendant's points,* disclose that a *child was born about* 1837. The importance of this case, in view of the objection of the contestant, Mr. Curtis, warrant my giving its particulars as it appears in 22 New York, 517. The syllabus of the case recites that "the acts of 1848 and 1849 to protect the rights of married women are not liable to objection, as impairing the obligation of a contract, because they defeat the expectation which the father of a living child had, previous to those acts, of being tenant in curtesy in lands acquired by his wife during converture, and subsequent to those acts."

This was an action in ejectment in the Mayor's Court of the city of Albany, by Margaret Thurber, a married woman, and another not her husband. Upon the trial it was proved that the plaintiff, Mrs. Thurber, married in 1833, and had a daughter, the issue of said marriage, who was living at the time of the trial, as was her father. The land in question came to Mrs. Thurber by descent in 1854.

The defendant, for the purpose of upholding a lease made by Mrs. Thurber's husband, asked the court to charge the jury that Mr. Thurber, by his marriage and the birth of a child, acquired an estate by the curtesy in the lands of his wife

equitable conversion.   This question was elaborately considered by the learned referee, and nothing need be added to his able and convincing opinion on that head.   The report in this particular was confirmed by the learned surrogate, and an opinion filed expressing full concurrence with the referee's views.   Subsequently, however, the learned surrogate decreed that the taxes and assessments which accrued against the real estate between the death of the testatrix and the date of the sale should not be paid out of the proceeds of such sale, but should be paid out of the income to be

which could not be defeated by the legislature.  The court charged to the contrary, and the defendant excepted.

The jury found for the plaintiff.  On appeal this judgment of the Mayor's Court was affirmed by the General Term of the fourth district, on all questions of law, and by the Court of Appeals in all respects.

In *Sleight* v. *Read* (18 Barb., 159), in the General Term of the first district, Judge CLERKE, referring to the acts of 1848 and 1849, asks, "What were the rights which *actually vested* in the husband previous to that act?"  And presents the following cogent summary of the law:

"In regard to real property belonging to the wife *at the time of the marriage* he took a vested interest, and became at once entitled to the rents and profits during their joint lives, and in the event of a birth of a living child to a contingent right on the death of his wife to the sole enjoyment of the estate during his life, *but as to any of her future acquisitions* the nature and extent of his interest were subject to any change which the legislature might thereafter make in the laws relating to the acquisition, disposition and enjoyment of property.  All regulations of this kind, the rules of inheritance, the rules relating to wills, successions and conveyances, and all the provisions by which the transmission of property is either directed or intercepted, are the offspring of law, and entirely dependent on the legislative power."

"Any person, therefore, whatever may be his prospective possible rights arising from existing legislation in regard to property *not yet vested in him*, is liable to have them abridged or altogether revoked by any future legislation, whether such person is an heir apparent, heir presumptive, or stands in the relation of a husband, whose wife may at any time afterward become entitled to property. The marriage contract does not imply that the husband shall have the same interest in the future acquisitions of the wife that the law gives him in the property she possesses at the time of the marriage, *but that he shall have whatever interest, if any*, which the legislature, before she is invested with them, may think proper to prescribe.  This is precisely the kind of contract to which Mr. B. and Mr. A. were, respectively, parties at the time of their respective marriages, and this contract, or the obligations to enforce it, has certainly not been impaired by the Act of 1849.

"Mrs. Bishop and Mrs. Alexander married previous to the death of their father, from whom this property descended, and previous to the enactment of this statute.

derived from the investment of these proceeds. This ruling, it seems to us, was not in harmony with his previous decision confirming the report of the referee. By that report and the decision confirming it, the taxes and assessments which accrued upon the property prior to the death of the testatrix were directed to be paid out of the proceeds of the realty. This was upon the distinct ground that, in order to carry out the provisions of the will and the intentions of the testatrix, an equitable conversion of the real estate into personalty for all the purposes of the will must be implied, and

"Instead of the law which existed at the time of their marriage, giving the husband a right to the rents and profits during the joint lives of the husband and wife, the legislature in its wisdom, or at all events in the legitimate exercise of its power, deemed it proper to enact that all future property descending to the wife should be transmitted to her, to her sole and separate use, and that she should hold the rents, issues and profits thereof, in the same manner and with the like effect as if she were unmarried.

" This was, in effect, a modification of the laws of inheritance entirely within the control and direction of the legislative power.

" This modification does not operate on a marriage contract made before its passage so as to be within the scope of the provision of the Constitution of the United States prohibiting to the States the passage of laws impairing the obligation of contracts, because, as I have shown, the interest of the husband in the future acquisitions of the wife is subject to the power of the legislature in controlling and directing the acquisition and disposition of property, and this contingency was an ingredient of the contract "

And so, too, it was held, in *Blood* v. *Humphreys* (17 Barb., 660), by Judge MASON in commenting on this law: "Neither does this act conflict with any provision of our State Constitution so far as the property in question is concerned; as the same was conveyed to her since the passage of that act.

" The legislature may qualify the wife to hold and convey property without in any manner depriving the husband of any of his property, and without impairing any of his rights of property; and, besides, all of these relations of after-acquired property are wholly dependent upon the municipal law and do not rest in any manner upon any contract, express or implied, between the parties."

An interesting case in connection with this subject is that of *Kelly* v. *McCarthy* (3 Bradf., 7), in which the learned surrogate discusses the contract of marriage with reference to the questions arising out of it regarding the *lex loci contractus*, and the *lex loci domicilii*, and says: "With regard to most, if not all of them, the weight of authority is in favor of the *lex loci domicilii* over the *lex loci contractus*, and on the obvious ground that there are many incidents of marriage not the subject of express contract, but flowing from municipal regulation and dependent, therefore, except as to *vested rights* in property, upon municipal regulation for their continuance. * * * Vested rights in the property of the wife, already acquired under the law regulating the marriage contract, cannot, of course, be disturbed by

that such equitable conversion was thereby effected. If the reasoning which led to this conclusion was correct, and we think the referee has demonstrated its correctness, then all the liens upon the property, whether accruing *before* or *after* the death of the testatrix, should be paid out of the proceeds of the sale. The real estate in question was vacant land, and no income was derived from it between the death of the testatrix and the time of the sale. The *cestui que trust* did not, therefore, benefit in the least from this property while the liens in question continued to accrue. And it

an alteration of that law, but it is quite a different thing to modify the law as to the incidents of marriage in respect to property to be acquired after the change of the law."

For these reasons we entertain no doubt that Mr. Curtis has not a life estate in the real estate of his wife as tenant by the curtesy. (See, also, Cooley's Const. Lim., 360–362; Schouler on Husband and Wife, § 213; *Ransom* v. *Nichols*, 22 N. Y., 110; *Moore* v. *City of New York*, 8 id., 110; *Holliday* v. *McMillan*, 79 N. C., 315; *Dunn* v. *Sargent*, 101 Mass., 336; *Hill* v. *Chambers*, 30 Mich , 422; *Matter of Clark*, 40 Hun, 237; *Southard* v. *Plummer*, 36 Me , 64.)

2. We come now to the consideration of Mr. Curtis' second objection, namely, that, as the husband of the deceased, by his marriage to her in the year 1832, he is entitled to receive the whole of her personal estate after the payment of her debts and funeral expenses.

And at the very threshold of the inquiry we must admit that the principle for which he contends is correct, with this restriction, that it should apply only to such personal property as Mrs. Curtis received *before* the said law of 1848–1849. Because, as to all personal property which she receives *after* the married women's acts went into operation, by the force of those very statutes a testamentary disposition of such personal property by his wife ended all possible claim by him to it. The question has been before the highest court of the State, and it has been repeatedly determined that the husband has a *vested* interest as to the personalty acquired by his wife before the acts, of which he cannot be deprived by legislation. ( *Westervelt* v. *Gregg*, 12 N. Y., 205; *Barnes* v. *Underwood*, 47 id., 351; *Ransom* v. *Nichols*, 22 id., 110; *Robins* v. *McClure*, 100 id., 328.)

But there is no proof before me that the personal property left by Mrs. Curtis was acquired by her prior to the statutes of 1848–1849. The testimony relative to what property Mrs. Curtis had at the time of her marriage, or at later periods during her married life, was given by her husband, who said that, at the time of their marriage, she had some property, "but not what we would call nowadays considerable. I can tell you very nearly the amount of property, I think. The amount of property my wife received from her father's estate, from the personal estate, was less than $9,000, and subsequently a piece of real estate was sold which was about four thousand — about $13,000. The amount received from her mother's estate was $15,000 — say about $28,000 in the aggregate. And she had at the time of her death personal property — one item of property for which she paid

was clearly *the net* proceeds of the sale, after paying all existing incumbrances — that is, existing at the time of such sale — which the testatrix intended by the fifth clause of her will to divide into eight equal portions.

The reasoning with regard to the liens existing when the testatrix died applies equally to those which accrued down to the date of the sale. We think that the decree on this head should be affirmed on the executor's appeal, and reversed on the appeal of Clara Isabelle Curtis and Julia Frances Munson.

$30,000, which is in the New York Central Railroad." This is all the testimony in the case relating to the personal estate of the deceased, except the language of the testatrix herself in her will, in which she says, "all the rest of my personal property *owned by me absolutely*, amounting now to about twenty-six thousand dollars," etc., etc.; and I cannot indulge the presumption that the personal estate actually left by deceased is a part or the whole of that of which her husband testified she received from the estate of her father or mother.

3. Having determined the objections raised by Mr. Curtis, it is proper to turn to those presented by his daughters, Clara Isabelle Curtis and Julia Frances Munson. They are five in number, but, excepting the fifth, they may all be condensed, substantially, in the single one, namely, that these ladies object to the bequest to their use of the residue of the personalty, contained in the fourth item of the will of their mother, being diminished or impaired by the payment, out of that fund, of that portion of the mother's debts, namely, the taxes, assessments or the liens or incumbrances which existed on the real estate at the time of their mother's death; that by the will a distinct trust of the real estate was created, and that all liens and charges against said real estate and all expenses and disbursements incurred by the executor in regard thereto should be paid out of the proceeds of the sale thereof, and, consequently, that the block of railroad stock, of which mention has been made, should be held subject to the trusts as to personal property created in said will. As to the *fifth* objection raised by them, namely, that certain legacies should be paid out of the proceeds of the realty, it is sufficient to say that it must have been made under a misapprehension on the part of the objectors, for the will explicitly provides that the legacies to Elizabeth S. Higgins and Eliza Fitzpatrick should be paid out of the proceeds of the sale of the real estate.

This question, then, of the daughters, involves a criticism of the character of the several bequests, and an interpretation of the language of the will of the testatrix. And at the very outset of the inquiry, looking at the will in its entirety, regarding the bequests that were imposed on the realty by the third and fifth items of the will, namely, first, by the foundation of an annuity from the *proceeds of the sale* of the real estate in favor of her husband; and, second, by the fact that the said legacies to Elizabeth S. Higgins and Eliza Fitzpatrick are to be paid out of the same *proceeds* in connection with the fact that a power of sale was given to the executor, which power he has exercised, we are led to the conclusion that there has been an equitable conversion of the realty into personalty for all the purposes

With regard to Mr. Curtis' appeal, we concur in the result
.arrived at by the learned surrogate, and also with the referee in the
;general discussion of the married women's acts of 1848 and 1849.

As to the rent of the Bridgeport house we differ with both the
learned referee and the learned surrogate. That rent was due to
the landlord, and he assigned his claim therefor to Clara Isabelle
Curtis. By this assignment Miss Curtis became entitled to payment
quite the same as the landlord would have been had the assignment
not been made. The estate had no claim against Miss Curtis which

---

, of the will. (*White* v. *Howard*, 46 N. Y., 162; *Van Vechten* v. *Keator*, 63 id., 52;
*Glacius* v. *Fogel*, 88 id., 434; *Lent* v. *Howard*, 89 id., 169; *Hobson* v. *Hale*, 95 id.,
. 588; *Chamberlain* v. *Taylor*, 105 id., 185 ; *Asche* v. *Asche*, 113 id., 235.)

But this equitable conversion cannot have the effect, as suggested by the learned
. counsel for the decedent's daughters, of causing all of the property, both real and
. personal, left by the testatrix to pass under the trust created by the fourth item of
the will ; indeed, in the view I entertain of the will, it cannot now make any
material difference whether or not there was an equitable conversion to any of the
parties interested. In case of an equitable conversion the executor has by virtue
. of his office the administration of both kinds of property, real and personal, and
. should account for all as assets. This the executor is, in fact, doing, and he now
brings the entire estate into court for distribution. (*Erwin* v. *Loper*, 43 N.Y., 525.)

But if we may regard the entire estate as personalty, how is it, then, relative to
.the provisions of the will ? We may then regard all the provisions contained in it
technically as bequests, and, so, let us see how they stand with reference to each
. other. The first, third, fifth and sixth items are what is termed *specific* bequests,
and the fourth and seventh items are *general* bequests. Now, it is an indisputable
rule that chattels *specifically* bequeathed cannot be sold for the payment of *general
legacies* and can be sold *for the payment of debts* only after the other assets not
specifically bequeathed have been applied (*Stall* v. *Wilbur*, 77 N. Y., 158); another
rule is that when the personal assets *not* specifically bequeathed are insufficient to
pay all the debts, *then* the *specific* legacies must abate or contribute, in proportion,
. to the value of their individual legacies. (2 Wms. Exrs., 1372). In other words,
though *general* legacies be swallowed up, it is only when the residuary and other
legacies have been sacrificed, and nothing remains of the personal estate for satisfy-
ing legal debts and charges, but what was specifically bequeathed, that *specific*
.and *demonstrative* legacies can be compelled to contribute for the deficiency. The
question becomes important, considering the fact that *at the time of the death* of the
testatrix the taxes and assessments resting on her real estate amounted, with interest,
to the great sum of $36,611.65. Who shall bear this great load? Shall it be deducted
from the proceeds of the real estate, or shall it be paid out of the personalty ?
And, primarily, shall the residuum bequeathed by the fourth item of the will be
. devoted as far as *it* will go to that purpose although it exhausts the entire fund pass-
ing under this item, which, as we have seen, amounts by the inventory to about
.$28,500. I was at one time inclined to regard this fourth item as a *specific* bequest,

could be set off against the debt for rent thus assigned. Whatever claim the estate had was against Miss Curtis and her sister Mrs. Munson, and even that was disputed. The remedy of the executor was by action against Miss Curtis and Mrs. Munson, and he was not entitled to reserve $500, or any other sum, from the personalty payable under the will, to himself as trustee, or from the income ultimately coming to the beneficiaries. Section 2812 of the Code of Civil Procedure is inapplicable to the facts under consideration. There was here no claim in controversy respecting

moved by the tendency of some modern decisions (Woodworth's Est., 31 Cal., 595; *Warley* v. *Warley*, 1 Bailey Eq. [S. C.] 397; *Godard* v. *Wagner*, 2 Strobh. Eq. [S. C.] 1; *Re Beckett*, 15 N. Y. St. Rep., 717), and so cast the burden of this mass of indebtedness proportionally on all the specific legacies; but greater study of the will leads me to the conclusion that the solution of the problem is to be found in the instrument itself. No light is to be obtained from the instruction in the second item of the will to the executors to pay all the debts of the testatrix and funeral expenses. Lord Chancellor Campbell says with reference to such directions: "I will not say that the words here relied on are mere words of style like the pious phrases with which the wills usually begin, but they do not seem to me to show that the testator had in mind the option given him of making the debt fall on the mortgaged land or on the personal estate." Nor does the statute (R. S., part 2, chap. 6, tit. 3, art. 2, § 27), preferring the payment of taxes, etc., by administrators and executors, necessitate their payment out of the personalty in the face of a contrary direction to be found in a will, the estate being solvent. What does the will in question say expressly or by implication? And in this interpretation of the will we should bear in mind that the canons of construction of wills are more liberal than those of contracts. The intention of the testator is the great guide, subject, of course, to this, that this *intention* be agreeable to the rules of law. It has been called the "polar star" by which the court should be guided, and though Redfield dislikes the expression as being too fanciful, nevertheless his whole learned treatise on the construction of wills points to innumerable examples of the endeavor of courts to learn the purpose or intention of the testator. In *Mann* v. *Mann* (14 Johns., 1) it is aptly said, by the learned counsel who argued the cause for the appellants, "the rules in regard to the construction of wills are that they must and ought to be construed liberally and benignly, not technically," and the court declared "that where there is a specific legacy charged upon a fund of any way doubtful description, that construction will be most favored which will prevent a total failure of the bequest. * * * It is the duty of courts to search for a construction that will carry it (the will) into effect."

Again, "the common-law rule that the personal estate of a deceased person will be applied to the payment of his contract debts to the relief of his real estate, is not, however, of universal application, and will not be enforced where it is in apparent hostility to the plain intent of the deceased as expressed in his will, and will defeat bequests made therein." (*Rice* v. *Harbeson*, 63 N. Y., 493, and see

the right of any person to share in the money to be distributed.
The decree in this respect should, therefore, be reversed, and the
executor required, without reservation, to pay Miss Curtis the
amount due for the rent in question, with interest. It should also
be reversed in the particular already pointed out, and the executor
required to pay all liens, assessments and interests out of the pro-
ceeds of the realty.

In all other respects the decree should be affirmed, with costs to

*Arcularius* v. *Geisenhainer*, 3 Bradf., 72.) Indeed, this humane principle of con-
struction has been crystallized in a maxim, one of the oldest in the law, which
comes to us even from the time of Bracton, and of the most frequent application
in this very matter of the construction of wills. *Benigne faciendæ sunt inter-
pretationes chartum ut res magis valeat quam pereat.*

Now, regarding the will in this benign spirit, with a full view of everything
within the four corners of the instrument (*Hoxie* v. *Hoxie*, 7 Paige, 192) what do we
find? We are first struck by the manifest intention on the part of the testatrix to
provide amply for her daughters, Miss Curtis and Mrs. Munson. Between them
she divides all her jewels, silver, works of art and household goods; gives them
equally a life estate in all the rest of her personal property and gives them for
life the chief portion of the real estatate. And, looked at more critically, we find
that she uses the word "proceeds" in four parts of her will, namely, in the third,
fourth, fifth and sixth items. The consideration we shall give to the *third* and
*fourth* will be sufficient for all. The third item looks to the possibility of a sale
of the realty *during the lifetime* of testatrix or *after* her death, in either of which
events she provides "from the proceeds" an annuity for her husband of $1,200.
Now, in the ordinary business of life, what are the *proceeds* of a transaction with
reference to those who are to be benefited by the outcome? Evidently, the amount
remaining after deducting the charges incidental to the matter. If a title to real
estate is to be closed, the grantee sees to it that all the taxes, assessments or other
liens are first deducted from the purchase-price and the remainder will generally
be said to be the *proceeds.*

Indeed, it is the *net proceeds* that the testatrix had in mind when the will was
framed. This becomes still more evident when we consider the language of
the fourth item of the will. In this she gives to her daughters' use "all the rest
of my personal property, owned by me absolutely, amounting now to about
$26,000, and except the proceeds of said plot of real estate." The exception was
made because there was, as we have seen, the possibility of the sale of the real
estate during her lifetime; and this very exception discloses that though *it might*
become personalty, still the fund of "about $26,000" she determined should
remain intact. Moreover, the testatrix announces about how much she expected
this fund or residuum would be — about $26,000. Bear in mind that the vouchers
filed herein show that *at the time the will was made* there were arrears of taxes and
assessments already amounting to upwards of $10,000. If these were contem-
plated to be deducted from the personalty she could not say "*about* $26,000," for

the executor, and to Miss Curtis and Mrs. Munson, jointly, payable out of the fund.

PATTERSON, J., concurred.

Decree affirmed (with the exceptions stated in opinion), with costs to the executor, and to Miss Curtis and Mrs. Munson, jointly, payable out of the fund.

there would not then have been that sum, but only about $16,000 for distribution. At the time of her death these unpaid taxes and assessments amounted, as we have seen, to more than $36,000, enough to far more than extinguish this legacy. Is it possible to entertain the idea that the testatrix intended to offer, as it were, Dead Sea fruit of bitterness and disappointment to the dearest objects of her benefactions. The only fair and reasonable construction of this will seems to be to regard the word "proceeds" as equivalent to "net" proceeds of the real estate. This will render the structure of the whole instrument harmonious, and will work no benefit to one part at the sacrifice of another. This is our conclusion, and so I have held that the personal property shall not be applied towards the payment of taxes and assessments on the real estate, and only to such debts of the testatrix as are not peculiarly incidental to the real estate.

4. There remains for consideration but one question of minor importance respecting the amount involved, though the dispute is very earnest regarding it. It appears that the testatrix was, at the time of her death, the lessee of a house in Bridgeport, Connecticut. The lease was for one year from October 16, 1886, to October 16, 1887, for the rent charge of $420. The testatrix died there on November 3, 1886. The testimony shows that her daughters, the contestants, continued to occupy the house from that time to the termination of the lease. The executor suggests in his account that the amount of the rent be charged against them. The landlord, Merritt Merwin, has, since this reference was ordered, assigned the claim for the entire rent to Miss Curtis, who now presents the claim and demands its payment. Some testimony was given by Mr. Curtis, who was called by the executor, that these ladies remained in the house "at the special request of Mrs. Curtis before her decease, that the children should remain there for the term for which she hired the house;" but if, by this evidence, it was sought to show that there was a *donatia causa mortis* of the outstanding term, it seems to me to be altogether insufficient. As I have deemed it within the jurisdiction of this court to determine the rights of these parties, I have set off against the probated claim of Miss Curtis, as assignee, for the rent, the relative value of the premises at the same rate ($420 per annum) for the period of time for which she and her sister occupied them.